IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville August 26, 2020

**STATE OF TENNESSEE v. PAUL STEVEN MURPHY**

**Appeal from the Circuit Court for Montgomery County**
**No. CC-2018-CR-343      William R. Goodman, III, Judge**

_____

**No. M2019-01786-CCA-R3-CD**

_____

A Montgomery County Circuit Court Jury convicted the Appellant, Paul Steven Murphy, of rape and incest. The trial court ordered the Appellant to serve concurrent sentences of ten years for the rape conviction and four years for the incest conviction. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his convictions and the length of the sentences imposed by the trial court. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ALAN E. GLENN, J., joined.

Gregory D. Smith (on appeal) and Chase Smith (at trial), Clarksville, Tennessee, for the Appellant, Paul Steven Murphy.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Kimberly Lund and Daniel Brollier, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

The Montgomery County Grand Jury returned a multi-count indictment charging the Appellant with one count of incest, one count of sexual battery by an authority figure, and one count of rape. The charges related to an incident that occurred between the

Appellant and the victim, M.M., his fourteen-year-old daughter. Prior to trial, the trial court dismissed the charge of sexual battery by an authority figure.[1]

The victim testified that she was sixteen years old at the time of trial and that her birthday was December 26, 2002. The victim identified the Appellant as her father.[2] When asked to describe some good things about her father, the victim said that he was "very hardworking," "love[d] everyone," and "trie[d] his best." The victim said that she and the Appellant used to sit on the couch in the living room and watch movies together. The victim lived with her mother, her younger brother, and the Appellant. The victim's older sister had moved out of the house when she was eighteen.

The victim said that she was fourteen years old when the Appellant raped her. She said that school was out on the day of the offense so that everyone could watch the solar eclipse. The victim's brother and the Appellant were also at home, but the victim's mother was at work. The victim, her brother, and the Appellant watched the solar eclipse and when it was over, went inside. The victim was getting ready to play with her brother when the Appellant told her to sit on the couch because he wanted to talk to her. The victim's brother went upstairs to play in his bedroom.

The victim said that the Appellant was mad but that she could not recall why he was mad. After she and the Appellant talked, he told the victim to go upstairs to his bedroom and sit on the bed. The victim did not ask the Appellant why he wanted her to go to his bedroom because she knew "not to ask questions." The victim thought they were going to watch a movie together. The victim said that when the Appellant came into the room, the Appellant had removed his pants and was wearing "[o]nly his shirt." He told the victim to perform oral sex on him, and she complied. The Appellant sat on the bed, and the victim knelt on the floor. The victim was crying, but she did not say anything to the Appellant. The victim said, "I did it, 'cause I didn't know what else to do."

The victim said that the Appellant began touching her with his hands and that she cried and told him she was not comfortable and did not want to do "it" anymore. The Appellant told the victim "to get on the bed and . . . he would give [her] something to cry about." The victim complied, and the Appellant removed her pants and underwear. He then penetrated her vagina with his penis. The victim asked the Appellant "why he was making [her] do it" and "told him [she] didn't want to do it." The Appellant did not respond. The victim said, "It felt really uncomfortable. I never did that before." The victim said that when she told the Appellant no, he told her to "shut up."

---

[1] The Appellant was also indicted for the aggravated assault of A.M., his son. The Appellant pled guilty to the aggravated assault charge and received a three-year sentence, which was ordered to be served concurrently with the sentences the Appellant received for his rape and incest convictions.

[2] The parties stipulated that the victim was the Appellant's biological daughter.

The victim said that the Appellant stopped because she "was screaming a lot, and [her] brother was crying. We could hear him in the other room." The victim explained that her brother's bedroom was close to the Appellant's bedroom and that the two rooms were separated by only a small bathroom. The victim said that she saw "[s]omething white" come out of the Appellant's penis and that the white substance went into her mouth. The victim said that the Appellant stopped and told her to go "clean off." The victim went into the bathroom, brushed her teeth, rinsed out her mouth, took a shower, and dressed in clean clothes.

The victim said that afterward, the Appellant told her not to speak of "what had happened" and cautioned that "he was gonna hit [her] if [she] ever spoke about it or that he was gonna get [her] out of the house." The victim said that she "felt hurt," "felt like it wasn't over," and "felt really uncomfortable because [she] didn't know what was going to happen."

The victim said that she went to her bedroom. Her brother came to her bedroom and asked why she was crying. The victim said that she "tried to pretend like nothing happened, and [she] went to go play with [her] brother in his toy room." The Appellant left the house and went to a gas station. After the Appellant returned home, the victim, her brother, and the Appellant watched a movie in the living room until the victim's mother came home from work. The victim said, "I felt uncomfortable, and I just felt like it wasn't gonna be the same again." The victim stated that she did not tell her mother what the Appellant had done that day because the victim "was afraid of what [her mother] was gonna think of [the Appellant]." The victim did not tell the neighbors because "it wasn't their business." The victim said that she did not tell anyone immediately because she "was scared of what people were going to think of [her] or what was gonna happen to [the Appellant]." She was also afraid because the Appellant told her not to tell anyone.

The victim said that "overall," she had a good relationship with the Appellant. The victim agreed that the Appellant was "in charge" and "control[led] the things in [her] house." The victim agreed that "[a]t some point," the Department of Children's Services (DCS) "got involved in her life" and that they came "a lot" but that she did not tell the DCS workers that the Appellant had raped her. The victim explained that the Appellant was still living in the home and that she "was scared of what [the Appellant] would do. . . . I didn't know if he was gonna get out and yell at me or hit me." The victim was placed in foster care on March 6, 2018. Around May 11, she finally felt safe living with her foster family and trusted them enough to tell them what the Appellant had done to her. The victim provided general details when she was examined at Our Kids Clinic because she "was scared of what would happen." The victim said that she still felt "scared" and "uncomfortable" testifying against the Appellant. The victim said that she had told her

foster mother, her foster father, and the doctor who examined her all of the details about the rape.

On cross-examination, the victim said that until March 6, 2018, she did not know that her foster care "was going to be permanent care away from" the Appellant. The victim agreed that despite her allegations that the Appellant raped her on August, 21, 2017, she did not mention the rape to DCS workers during the numerous interviews that occurred between October 2017 and March 12, 2018. The victim acknowledged that she was already out of the Appellant's house but stated that she was still afraid he would hurt her.

The victim could not recall the exact day she had to leave the Appellant's house. The victim denied that she and her older sister "concocted" the rape allegation against the Appellant. She stated that she was willing to testify at trial because she was no longer afraid of the Appellant. The victim said that she had not told the full truth previously because she did not trust medical personnel but that she was telling the full truth at trial because she was under oath. The victim asserted, "I would not lie about my father raping me." The victim said that she told her older sister about the rape the week after it happened. The victim did not trust anyone else enough to tell them about the rape. The victim said, "I have always been scared of my father." She acknowledged that "overall" she and the Appellant had a loving relationship and explained, "Yes, he is loving. Yes, he is scary. He can be loving and scary at the same exact time."

On redirect examination, the victim explained that she saw the Appellant at home on the morning of March 5, 2018, before she went to school. Later that day, a DCS worker spoke with the victim at school, and that night she stayed "at the DCS place" before being placed with her foster family. The victim stated that the Appellant had "left the family multiple times" but not at the request of DCS. She explained, "He left when I was born. Came back to my life when I was two. He has had multiple people that he has gone to live with, girlfriends." The victim stated that she was in six foster homes between March 6 and May 11 when she went to live with her current foster family. She explained that trusting people was hard because she "was being dragged out of every single home [she had] ever been in."

The victim said that the Appellant's mood could change instantly and that "no matter what, one little thing could set him off." When the Appellant's mood changed, "you never knew what was gonna happen." The victim said that "the good times [were] good" and that the bad times "were horrible." The victim said that her foster family loved her and that she had learned from her foster father how a father was supposed to act around his child.

Denise Alexander testified that she was a social worker with Our Kids Clinic, which was an outpatient facility that saw children when concerns of sexual abuse or sexual assault

were raised. Ms. Alexander said that she saw the victim at the clinic on April 3, 2018, following a referral by DCS. Ms. Alexander said that the victim was soft-spoken, friendly, cooperative, and seemed to understand the questions and the situation. Later in the interview, the victim "became somewhat disengaged from the conversation. Became quiet and tearful; staring at the floor." Afterward, Ms. Alexander gave the information the victim provided to the medical provider, Leanna Dugan.

Leanna Dugan testified that she was a nurse practitioner with Our Kids Clinic and that she performed forensic medical evaluations on children when there were concerns of sexual abuse. The trial court qualified Ms. Dugan as an expert in pediatric care and examination. Ms. Dugan opined that often sexually abused children did not disclose the abuse immediately and that the reports can occur days, weeks, months, or years after an assault. She said that in the case of delayed reporting, no "fresh injury" or fresh physical evidence would be discovered by a physical examination. Nevertheless, the children were examined for injuries or tears in the genital or anal areas and to ensure they had no signs or symptoms of infections such as sexually transmitted diseases.

Ms. Dugan said that she saw the victim on April 3, 2017. The victim was referred to Our Kids Clinic by a DCS worker because of concerns of sexual assault. Before the examination, Ms. Dugan met with Ms. Alexander to determine what the victim had told Ms. Alexander. Ms. Dugan learned that the victim had reported that her father, the Appellant, had raped her on the day of the eclipse in August 2017. Based on the delay in reporting the incident, she did not expect to find any signs of injury or past injury. Ms. Dugan explained that after children go through puberty, the hymen becomes "very stretchy" and heals quickly. Ms. Dugan stated that the victim was fifteen years old at the time of the examination and was already going through puberty. Ms. Dugan said that the results of the victim's examination were normal.

On cross-examination, Ms. Dugan said that Our Kids Clinic allowed a parent or guardian to be in the room during an examination only if the child wanted the person to be present. No parent or guardian was in the room with the victim during the examination. Ms. Dugan said that "[o]ther than some dental issues, [the victim] was healthy."

Detective Allen Pendarvis with the Clarksville Police Department testified that he was present for the interviews the victim gave DCS on March 12 and March 23, 2018, but that he did not ask any questions. He stated that he had spoken with the victim on the telephone. Thereafter, on April 2, the case was presented to the grand jury.

On cross-examination, Detective Pendarvis explained that the March 12 and March 23 interviews were "forensic interviews." He observed the interviews "via closed-circuit monitoring." Detective Pendarvis said that he did not participate in the interviews because he did not have specialized training in interviewing children.

The forty-two-year-old Appellant testified that he went to work early on the morning of August 21, 2017, which was the day of the alleged rape. The Appellant left work between 11:30 a.m. and noon because he wanted to go home and experience the solar eclipse with his children. On the way home, he stopped and bought candy and sodas for the children. He arrived home around 12:30 or 1:00 p.m. The Appellant said that he watched the eclipse with his son and the victim while his wife was at work. After the eclipse, the Appellant and the children went inside the house. The Appellant's son went to his bedroom to play. The victim watched television and used her laptop computer in the living room. The Appellant sat in the dining room and called his boss.

The Appellant said that he never told the victim to go to his bedroom, that he did not order her to perform oral sex on him, and that he did not penetrate the victim's vagina with his penis. The Appellant said that he did not "look at kids as a sexual object."

The Appellant said that he and his wife "ran the household." The Appellant denied that he "frequently" watched movies while in bed or that he would "frequently" lie in bed alone with the victim. The Appellant denied lying in bed with the victim on the day of the alleged offense.

The Appellant said that he was surprised by the victim's allegations. The Appellant said that from January to March, "it didn't feel like home anymore. It was quiet. . . . [I]t was more of roommates in the house anymore." The Appellant attributed the difference in the home to "all the other traffic from outside sources that were coming in and out of [his] home." The Appellant asserted that he remembered the day of the alleged rape "vividly" and that he did not sexually assault the victim.

On cross-examination, the Appellant said that he had never told the victim to go to his room. He said that he, his wife, and the victim had watched a movie in his bedroom but that he had never watched a movie in his bedroom alone with the victim. The Appellant said that on the day of the alleged rape, his son played with his toys in his room but that his son did not cry. The Appellant denied that he ran a strict household and stated, "I don't control anything. We work together as a family."

The Appellant said that DCS "made four home visits in a year." He acknowledged that DCS came to his home on August 12, 2017; October 27, 2017; and March 5, 2018. The Appellant said that he was arrested on March 6, 2018. Until that time, the Appellant had been living with his wife, his son, and the victim in the family home. The Appellant denied having a temper, saying, "I get irritated just like everybody else does. No more, no less." The Appellant said that he was irritated when DCS "accused him" instead of just asking questions.

- 6 -

The Appellant estimated that the eclipse ended around 1:50 p.m. and that he spoke with his boss three or four times for approximately thirty minutes each time. He also called his wife. He said that he never went to his bedroom during the day.

The Appellant said that he and his wife did not allow the children to come into their bedroom unless both parents were at home. The Appellant explained, "I was raised that children don't go in their parents['] bedroom."

The Appellant said that he learned about the victim's allegations when communicating with his older daughter on Facebook. The Appellant did not know if the victim took a shower on the day of the alleged offense. The Appellant said that the victim was not upset that day and that she had no reason to be upset.

The jury found the Appellant guilty of the charged offenses of rape, a Class B felony, and incest, a Class C felony. The trial court sentenced the Appellant to concurrent sentences of four years and ten years, respectively. The trial court ordered that the Appellant be placed on the sex offender registry and on community supervision for life.

On appeal, the Appellant contends that the evidence is insufficient to sustain his convictions and that the trial court erred in enhancing the Appellant's sentence for rape from the minimum sentence of eight years to ten years and his sentence for incest from three years to four years.

## II. Analysis

### A. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the Appellant's innocence and replaces it with one of guilt, so that the Appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The Appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

In order to sustain the Appellant's conviction of rape, the State needed to prove the "unlawful sexual penetration of a victim by the [Appellant]" and that "[f]orce or coercion [was] used to accomplish the act[.]" Tenn. Code Ann. § 39-13-503(a)(1). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the [Appellant's], or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7). "'Force' means compulsion by the use of physical power or violence and shall be broadly construed to accomplish the purposes of this title." Tenn. Code Ann. § 39-11-106(a)(12). Further, "[a] person commits incest who engages in sexual penetration . . . with a person, knowing the person to be, without regard to legitimacy . . . [t]he person's natural . . . child . . . ." Tenn. Code Ann. § 39-15-302(a)(1).

On appeal, the Appellant contends that the evidence is insufficient to sustain his convictions of rape and incest, arguing that he "bluntly" denied having sexual relations with the victim and that the victim did not make any allegations against him until after the Appellant made her leave the family home. Additionally, the Appellant complains that the forensic examination showed no evidence of sexual assault. In essence, the Appellant claims that the victim was not credible.

The Appellant also complains that the victim's older sister and younger brother, who did not testify at trial to corroborate the victim's testimony, were "missing witnesses" and "that it was reasonable to presume their testimony was unfavorable to the State."[3] The Appellant contends that "[t]his is a classic 'he said/she said' scenario" and that "the logic" of the missing witness rule should apply. The Appellant asserts that the victim's brother and sister were in foster care, were "under the exclusive control of the State," and were "estranged" from the Appellant.

In support of his contentions, the Appellant cites State v. Jones, 598 S.W.2d 209 (Tenn. 1980). The State correctly notes that Jones is distinguishable from the instant case. In Jones, the prosecution failed to call a witness who "possessed 'peculiar knowledge

---

[3] The Appellant asserts that he is not raising the issue in the context of jury instructions but "solely" in the context of sufficiency of the evidence.

- 8 -

concerning facts essential' to th[e] case . . . [as s]he was the only witness to the entire sequence of events." Id. at 224. In the instant case, neither of the siblings were witnesses to the rape. Our supreme court has explained that "the State is under no obligation to produce every possible witness. The quid pro quo is that the defendant may be entitled to a missing witness charge." Id. However, as the State notes, the Appellant did not seek a missing witness instruction.

Moreover, the Appellant's complaints about the proof are merely challenges regarding the victim's credibility. Determining the credibility of witnesses is within the purview of the jury. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). Our courts have repeatedly held that the testimony of a rape victim is sufficient standing alone to sustain a conviction. See State v. Elkins, 102 S.W.3d 578, 582-83 (Tenn. 2003); State v. Wyrick, 62 S.W.3d 751, 767 (Tenn. Crim. App. 2001). In the instant case, the jury clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). In the instant case, the victim testified that the Appellant ordered her, his daughter, to go into his bedroom. Once they were both in his bedroom, he ordered her to perform oral sex on him and afterward proceeded to penetrate her vagina with his penis. The victim explained that she feared the Appellant and that she did not reveal the Appellant had raped her until she was living with a foster family and felt safe with them. The victim's testimony alone is sufficient to sustain the Appellant's convictions of rape and incest.

## B. Sentencing

The Appellant contends that the trial court erred by enhancing his sentence from eight years to ten years for his rape conviction and from three years to four years for the incest conviction. At the sentencing hearing, the Appellant acknowledged that he was waiving his right to be considered for probation. The State and the trial court acknowledged that "[t]here is no psychosexual report in the file." Defense counsel stated, "I spoke with [the Appellant] and – about that, about wa[iving] the – the psychosexual issues with it. And he understands the ramifications of that."[4]

The Appellant did not call any witnesses but was given permission to make the following allocution:

---

[4] We note that because the Appellant did not seek a probationary sentence and because the Appellant did not complain about the lack of a psychosexual report, the trial court did not err by proceeding to sentence the Appellant without a psychosexual report. See State v. Russell Wheeler, Jr., No. W2020-00030-CCA-R3-CD, 2021 WL 1423124, at *5 (Tenn. Crim. App. Apr. 15, 2021); State v. Gregory Moore, No. M2012-00528-CCA-R3-CD, 2012 WL 4141808, at *6 (Tenn. Crim. App. at Nashville, Sept. 19, 2012).

Your Honor, I – I know there's been a lot of things that have gone on in this case and things that are weighing against me.

And I just wanted to say that if I could take things back, I would, and I'm sorry for everything that has transpired against my family and against my kids. I – I don't get any redo's. Nobody does. I just – all I can say is I'm sorry.

The trial court noted that the Appellant's presentence report reflected that he had a prior conviction of domestic assault. Accordingly, the trial court applied to both convictions enhancement factor (1), namely that the Appellant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range. Tenn. Code Ann. § 40-35-114(1). The trial court also applied to both convictions enhancement factor (14), namely that the Appellant abused a position of public or private trust in a manner that significantly facilitated the commission or the fulfillment of the offense. Tenn. Code Ann. § 40-35-114(14). The trial court stated that the Appellant committed the offenses "as a result of the family relationship." The trial court did not apply any mitigating factors. The trial court imposed concurrent sentences of ten years for the rape conviction and four years for the incest conviction.

This court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). In conducting its review, the trial court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Appellant in his own behalf; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the Appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

The Appellant contends that the trial court erred by imposing an enhanced sentence for his rape conviction and by applying the violation of a position of private trust enhancement factor to his incest conviction. The Appellant contends that a discussion during the sentencing hearing "made it clear that neither the Trial Court, the defense or the State were confident about [the Appellant's] prior criminal record." The discussion to which the Appellant refers relates to his prior conviction of domestic assault. Regardless, the Appellant's criminal history was not limited to the domestic assault conviction.

The Appellant's presentence report reflects that the Appellant had three prior convictions of misdemeanor theft on September 21, 2001, February 28, 2001, and August 16, 2000, and multiple traffic infractions in addition to the conviction of "domestic assault with battery out of Prince William County, VA" on February 17, 2000. The Appellant also had a conviction of domestic violence in Montgomery County on November 28, 2017, for which, according to the presentence report, he was granted probation that was later revoked. In a sentencing memorandum and at the sentencing hearing, the Appellant argued that he had "a conviction for Domestic Assault that was entered on March 19, 2018 after being placed on judicial diversion on March 19, 2018." At the sentencing hearing, the trial

court acknowledged that defense counsel "was right as to the diversion. But, now, the pre-sentence report indicates a prior conviction for domestic assault." The trial court noted that the conviction was in Virginia. On appeal, the Appellant contends that based upon the dispute regarding the accuracy of the presentence report, the trial court erred by applying the enhancement factor (1). We agree with the State that in addition to the reported domestic assault conviction, the multiple theft convictions alone support the application of enhancement factor (1). See Tenn. Code Ann. § 40-35-114(1); State v. Gutierrez, 5 S.W.3d 641, 644 (Tenn. 1999).

The trial court also applied enhancement factor (14), that the Appellant abused a position of private trust in committing the offenses. Tenn. Code Ann. § 40-35-114(14). The Appellant contends that this factor should not have been applied to enhance his sentence for his incest conviction, arguing that "[a] family relationship is required as an essential element for [i]ncest." However, this court has "consistently held that the existence of a position of trust is not an essential element of the crime of incest because Tennessee Code Annotated section 39-15-302 prohibits sexual penetrations among a wide relations, including parent and child." State v. Jeffery Brian Parks, No. M2003-02002-CCA-R3-CD, 2004 WL 1936404, at *4 (Tenn. Crim. App. at Nashville, Aug. 30, 2004) (internal citation and quotation marks omitted); see State v. Clayton Eugene Turner, II, No. 03C01-9805-CR-00176, 1999 WL 817690, at *17 (Tenn. Crim. App. at Knoxville, Oct. 6, 1999); State v. Michael D. Keen, No. 01C01-9804-CR-00192, 1999 WL 254384, at *7 (Tenn. Crim. App. at Nashville, Apr. 30, 1999). Therefore, the trial court did not err by applying this enhancement factor to the incest conviction. State v. Grady Alton Vest, No. W2018-01694-CCA-R3-CD, 2019 WL 7288803, at *6 (Tenn. Crim. App. at Jackson, Dec. 30, 2019), perm. to appeal denied, (Tenn., Apr. 17, 2020).

### III.  Conclusion

Finding no error, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE